PEARLINE SUTTON *v.* FELIX A. SUTTON

5-5471                                          463 S. W. 2d 644

Opinion delivered March 1, 1971

*William E. Johnson,* for appellant.

*Ovid T. Switzer, Bruce D. Switzer* and *Tom Tanner,* for appellee.

CONLEY BYRD, Justice. Appellant Pearline Sutton questions the sufficiency of the evidence and the corroboration to sustain the award of a divorce to appellee Felix A. Sutton on the ground of personal indignities. No property rights are involved, on this appeal.

Felix testified that he and Pearline were married in 1950 and had one daughter who is now of age. When they married, they moved into a house with his parents and were still living with his father and mother when Felix left on July 5, 1969. When his daughter was old enough to be in a room by herself, Pearline moved into the daughter's room and stayed almost two years. During that time they rarely had marital relations. When Pearline moved back into his room, their relations did not improve. He then told his wife that something had to be done, or he would leave when his daughter grew up. In 1960 he took a job as a timber contractor. His work hours were from 5:30 A.M. to 9:00 or 10:00 P.M. About the same time his wife's brother was permanently injured while working 'in the timber woods. Felix helped the brother's family take him to hospitals for treatment. In addition, his logging business required record keeping,

food supplies for his timber cutters and storage for his equipment. The brother's wife had had some college bookkeeping courses and also ran a grocery store. Felix arranged for the brother's wife to keep his books and to make out his payrolls and tax returns. Also his men assembled at the store each morning and parked his equipment there each evening. This arrangement continued after the brother's death. During the last few years of their marriage Pearline falsely accused him of going with other women. About a year before he left, she refused to have marital relations with him. At that time he moved into a separate room.

Jim Sutton, Felix's father, testified that on more than one occasion he had heard Pearline accuse Felix of adultery. On cross-examination Jim Sutton was specific as to only one accusation some two years before the date of trial.

Pearline testified that she went to bed with her daughter because the daughter was scared. That, even then, she did not intend to stay but would drop off to sleep before Felix went to bed. She corrected the matter by getting a night light. Pearline also stated that people in the community had told her that Felix and her sister-in-law were having an affair. On August 5, 1968, Felix came home about 2:00 A.M. That night he wanted to make love and she refused. In refusing she told him that if she couldn't be his wife, she wasn't going to be his mistress. The next night Felix moved into a separate room. On cross-examination she readily admitted that she had accused Felix of having an affair with her sister-in-law.

Peggy McGaha, appellant's niece and the daughter of appellant's brother, testified that appellant did not come around while her father lay confined as an invalid. She considered the gossip that her mother and Felix were having an affair ridiculous. According to her, in that community gossip without any basis was not uncommon.

The Chancellor here had the opportunity to observe

the parties and their demeanor in the court room. Admittedly Pearline did not continuously and systematically accuse Felix of "going with" her sister-in-law but she did allow a rumor, supported by her uncorroborated suspicion, to create an "Iron Curtain" between her and Felix. As a result the marriage had been an empty shell for more than a year before the separation. Under such circumstances we are unwilling to say that the Chancellor's findings resulting in the decree of divorce are not supported and corroborated by the weight of the evidence.

Affirmed.

HARRIS, C. J. and FOGLEMAN & JONES, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I respectfully dissent because I do not find any evidence of grounds of divorce, much less corroboration of appellee's testimony. I am unable to recognize the evidence which shows indignities to the person, which I understand to be a course of conduct evidencing settled hate, alienation and estrangement, habitually and systematically pursued by one spouse, which renders the condition in life of the other spouse intolerable. See *Settles v. Settles*, 210 Ark. 242, 195 S. W. 2d 59.

The action was based upon appellee's charge that appellant had accused him of running around with her brother's wife and had denied him conjugal relations.

These parties were married December 31, 1950. Appellee said that they began having difficulties soon after their marriage when their child was two or three years old. He claimed that the wife then moved into the child's room for two years. She then moved back in with him, but even though he claimed that their relationship did not improve, he did not move into another room until a year before the separation. Five days after leaving appellant without notice, appellee also left Louisiana and came to Arkansas.

His testimony to support his allegation relating to accusations was the simple statement that during the last few months of their marriage, Mrs. Sutton had accused him of going with other women. He could not remember the dates on which she made these accusations, but said that the first such accusation was made five or six or seven years ago. He said that only a month or two before he left, while they were in bed together, she said he had no right to be her husband because he had been running around with other women. He said that one other time about a year earlier she accused him of running around with a woman, but he couldn't recall any details. He could not recall any other specific incident where there was an accusation. According to him, she never accused him in front of other people, and he did not discuss it with anyone or know of anyone who heard the accusations.

Appellee said that he and his wife spent little time together during the last year. He explained that he went to work at 5:00 a.m., and he was often home late because of his job. He said he didn't spend much time with her on weekends because they had things to do. Mrs. Sutton and their daughter usually went to church on Sunday, but he hadn't gone with them for years. He would go fishing or do other things. He admitted that he made no effort to get things straightened out with his wife. He said he told her several years ago that unless some changes were made, he was going to leave when their daughter was grown, and he did. He admitted that she was no more at fault than he. He doesn't feel that she hates him, and he doesn't hate her. He admitted that she did *not* exhibit hate toward him or deliberately try to do evil. He also admitted that it was possible that the time he spent with his wife's sister-in-law might have given some reason for the suspicions expressed by Mrs. Sutton.

Appellee's father's testimony was vague. On direct cross-examination, he only said he knew that the couple had experienced some difficulties and that he had heard appellant accuse his son of going with her sister-in-law. It was brought out on cross-examination that

this occurred two years earlier, before appellant's brother died. He said Mrs. Sutton only said she didn't think it was right for him to do that. He only heard a little bit of conversation between them, and described it as not being anything much. On redirect examination, he said he had heard Mrs. Sutton accuse Sutton more than once clear up to the separation, but then admitted, on recross-examination, that he really couldn't say that she had accused him more than the one time.

Significantly, the chancellor found that Mrs. Sutton did not continuously and systematically accuse her husband of "going with" her sister-in-law, but had allowed a rumor supported by her suspicion to create an "Iron Curtain" between her and her husband, causing the marriage to become an empty shell. He found authorities relied upon by appellant persuasive and said that they would probably be followed if there was any evidence of possibility of reconciliation. The issue of lack of sexual relationship was noted but not considered by the trial court.

Among the authorities relied upon by appellant to which the chancellor referred was *Smiley* v. *Smiley*, 247 Ark. 933, 448 S. W. 2d 642. This is probably the latest expression of the court on the ground for divorce relied upon here. We there reiterated the long standing rule that in order to sustain this ground for divorce there must be clear evidence of unavoidable and unendurable evils incapable of relief by reasonable exertion and of settled hate, enduring alienation and estrangement.

Sutton's testimony itself casts grave doubt upon the unavoidability of the evils of which he complains. He has made no effort to conduct himself in a manner which might allay the suspicions of his wife which he admits are not unreasonable, though he claims total innocence. Not only has he failed to show that the evils of which he complains cannot be relieved by reasonable exertion, he admits that he had made no effort at all. His admission that the situation was as much his fault as hers should settle this matter and bar

the relief he is getting. Where the parties are equally at fault, there must at least be something that makes cohabitation unsafe before the courts will interfere. *Meffert* v. *Meffert,* 118 Ark. 582, 177 S. W. 1.

By his own testimony there is no evidence of any hate. The chancellor found that the conduct relating to the accusations was not systematically and habitually pursued, thus totally eliminating a primary ingredient of this ground of divorce. *Preas* v. *Preas,* 188 Ark. 854, 67 S. W. 2d 1013; *Sutherland* v. *Sutherland,* 188 Ark. 955, 68 S. W. 2d 1022.

Other language of *Meffert* is pertinent. There we sustained the denial of a divorce upon somewhat similar evidence. We said:

> There appears to have been nothing in the conduct of the husband with the member of the choir referred to in this record other than that which may be characterized under the well-known term, "flirting." Still the husband persisted in his attention to her after he knew that his wife objected to it. He knew that his wife's condition was such that she was easily excited and, under the circumstances, he should have refrained from paying any further attention to another woman, but should have devoted his life to his wife and children.

In *Preas* there is also language appropriate to this case:

> In the case at bar, there is nothing in the testimony of Preas tending to show that the acts of his wife complained of arose from any fixed malevolence or settled hate, but the proper inference is that her conduct was occasioned by a physical and mental condition caused largely by his own acts.

In *Sutherland* v. *Sutherland,* supra, we held that a few trivial instances of petulance were not sufficient to constitute grounds for divorce. We further said:

The most charitable view of the testimony presented in this record in behalf of appellee is to say that both parties were somewhat in fault, and that both, by failure to exercise that mutual forgiveness which the relationship demanded, aggravated, rather than tended to ameliorate their conjugal state. Had the parties to this unfortunate marriage heeded the admonitions of this court, "A little confessed, a little endured, a little forgiven and all is cured," as announced in *Arnold* v. *Arnold,* supra, this now unhappy couple would be enjoying the associations usually consequent to the marriage status.

Furthermore, accusations of infidelity, in order to constitute any basis for this ground for divorce must have been not only false, but with the intent to wound, and are not to be treated as indignities if based upon doubts and suspicions reasonably born of appearances. *Cooper* v. *Cooper,* 223 Ark. 235, 265 S. W. 2d 4. See also, *Relaford* v. *Relaford,* 235 Ark. 325, 359 S. W. 2d 801.

This is clearly not a case where unfounded accusations were made in conversations with others as was the case in *Dennis* v. *Dennis,* 239 Ark. 384, 389 S. W. 2d 631; and *Relaford* v. *Relaford,* supra. I repeat that appellee's own testimony bars any relief to him. It is not a matter of credibility of witnesses as appellee suggests.

Little attention need be given the question of corroboration. While it may be slight in a case clearly not collusive, it must have some substance. The isolated instance of which appellee's father knew certainly does not meet the test any more than did the corroborating testimony about isolated instances we rejected in reversing a divorce decree in *Smiley* v. *Smiley,* supra. No resort can be had to appellant's testimony or admissions for corroboration. *Stearns* v. *Stearns,* 211 Ark. 568, 201 S. W. 2d 753.

Society's interest in the preservation of marriages seems to me to be as great as ever. The many assaults

being made upon the institution seem to me to intensify that interest. Our society will not fall with the result of one divorce case. Yet when we of the judiciary fail to regard established principles, a process of erosion is accelerated. There may come a day when hope of reconciliation or its lack determines the results in divorce cases. We have said that futility of any such hope coupled with utter incompatibility is not sufficient. *Davis* v. *Davis,* 163 Ark. 263, 259 S. W. 751. If this principle has become obsolete and the preservation of marriage ties is to depend upon hope of reconciliation, the legislative branch of this government should amend our laws on grounds for divorce to so state.

Unlikelihood of reconciliation has, on occasion, been considered by the courts when grounds for divorce have been shown by one party or the other or both. *Edwards* v. *Edwards,* 222 Ark. 626, 262 S. W. 2d 130; *Ayers* v. *Ayers,* 226 Ark. 394, 290 S. W. 2d 24. It is inappropriate here.

I would reverse this decree.

I am authorized to state that HARRIS, C. J. and JONES, J., join in this opinion.