RELAFORD v. RELAFORD.

5-2741                                                  359 S. W. 2d 801

Opinion delivered September 10, 1962.

*R. D. Rouse,* for appellant.

No brief filed for Appellee.

CARLETON HARRIS, Chief Justice. This is a divorce action. Appellant, Mildred Lucille Relaford, instituted suit against appellee, James William Relaford, alleging general indignities. The husband answered, denying the allegations, and filed a cross-complaint alleging that "plaintiff became interested sexually in divers men * * * That plaintiff persists in her association with divers men." The parties are the parents of six minor children, and each sought custody of said children. On trial, the court held that neither party was entitled to a divorce, in that both "have been guilty of such indignities to the person of the other as to render either of them unable to come into court asking for relief with clean hands." Custody of the six children was granted to appellant, and appellee was directed to contribute the sum of $10 per week toward the maintenance of the children. From the decree so entered, appellant brings this appeal.

Actually, the only question posed is whether appellant was entitled to a divorce. The parties were married in May, 1946, and lived in Nevada County before moving to Little Rock in October, 1959. They separated in June, 1960. According to appellant, appellee offered indignities

almost from the commencement of the marriage. "Well, he was all the time talking about me to other men. I would go to town after things and he was all the time saying he didn't know how much money I had when I left—I didn't have any money when I left, but he didn't know how much I'd come back with and on occasions he would tell them I would drink anything I could get my hands on, and then in one instance he told me I was tired of him and said 'You ought to try Fred, he may be the "coon-dog" you are looking for.'" This was a reference to Fred Virden, supposedly a friend to both parties. Mrs. Relaford testified that on occasions when some man would be in the house to spend the night, her husband would invite the visitor to sleep with her, and she mentioned a very vulgar statement made when the Relafords and Virden, on one occasion, were visiting the zoo. Appellant stated that her husband "made out like he was joking," but she did not consider it very humorous. Mrs. Relaford testified that her husband did quite a bit of drinking. She stated that on an occasion, she visited the doctor for an examination. The doctor sent a bill for $11. According to her evidence: "He said I had a baby done away with—said no Doctor would charge $11.00 for an examination," and he "harped" on the subject constantly. This accusation was the "final straw" that caused Mrs. Relaford to leave her husband, and return to Nevada County. She further testified that on an occasion when she, Virden, and her husband were at home, that appellee told Virden "she had your baby done away with." This statement, along with several other accusations, was verified by Virden.

Mr. Relaford denied most of the testimony of his wife. As to the last mentioned accusation, after learning about the $11 doctor bill, Relaford stated that he did not say she had done away with a baby. "No, sir, I didn't accuse her of it, I just said it was a good sign." Obviously, this was, in effect, an admission of making the charge.

Twelve witnesses testified on behalf of appellant, and seven witnesses appeared for appellee. Without detailing the testimony, which would serve no useful purpose, suffice it to say that not a single witness testified to any

illicit relationship between Mrs. Relaford and any man, nor to circumstances that would establish that such a relationship existed. The strongest testimony was that Virden, divorced from his wife, had often visited in the Relaford home, and that Mrs. Relaford at times laundered her clothes in the Virden home. As to the first, Virden frequently visited when Relaford was present, and according to appellee's own evidence, was a close friend. Relaford likewise testified that Virden had endeavored to help him obtain a job, and had assisted in other ways. As to the laundry, Mrs. Relaford stated that her own washing machine was out of order, and that all children were present on each occasion when she went to the Virden home to use the washing machine; that at times, she did her ironing there at night in order for the children to watch television. In fact, the only evidence that suggests in any manner an improper relationship between Mrs. Relaford and any man was contained in the depositions of Paul M. Adams and C. D. Tomlin, both former employers of Relaford. That evidence consisted of answers to the following interrogatories:

(To Adams) "State whether or not James William Relaford, the defendant, exhibited to you several letters bearing the purportedly written name of Fred Virden of Prescott, Nevada County, Arkansas, as writer, to plaintiff, Mildred Lucille Relaford?

A. I saw the letters.

Q. If any such letters were presented to you, state whether or not the name of Fred Virden was affixed to the envelopes and/or as signature to said letters?

A. They were affixed to the envelopes as return addresses and he signed the letters by his first name.

Q. State whether or not you read all or any part of said letters?

A. I read all of them.

Q. State whether or not the contents of said letter or letters reflected any amorous statement or assertions by Fred Virden to Mildred Lucille Relaford?

A. Yes.''

(To Tomlin) ''State whether or not James William Relaford, the defendant, exhibited to you several letters bearing the purportedly written name of Fred Virden of Prescott, Nevada County, Arkansas, as writer to plaintiff, Mildred Lucille Relaford?

A. One is all I read.

Q. If any such letters were presented to you, state whether or not the name of Fred Virden was affixed to the envelopes and/or as signature to said letters?

A. They was.

Q. State whether or not you read all or any part of said letters?

A. I read all of one.

Q. State whether or not the contents of said letter or letters reflected any amorous statement or assertions by Fred Virden to Mildred Lucille Relaford?

A. They did.''

The letters were not exhibited (Relaford testified that he gave them back to his wife); no questions were propounded as to contents of the letters; the witnesses could not state, of their own knowledge, that the letters came from Virden, or bore his signature, nor was there any further effort to explain what was meant by ''amorous statement''. In any event, whatever was written, of course, *was not written by Mrs. Relaford,* and without further illumination of the contents of the letters, appellant cannot be held responsible for assertions or sentiments expressed by the writer.

The testimony reveals that Mrs. Relaford was employed during the time the parties were living together, enabling a better living for the family, and that she worked hard after the separation to take care of the six children. During the marriage, she labored in the hay fields with other farm employees for Mr. Owen Garrett, and hauled hay to Little Rock and Shreveport with Mr.

Garrett. This was done, according to appellant's testimony, at the request of her husband, and he admitted that he did not object to her doing this work.

This case was tried on August 7th, 1961, and Mr. Relaford stated that he had only given his wife $13 since January 1, 1961, for child support.[1] In fact, according to the sheriff of Nevada County, Relaford had been tried and convicted in the Justice of the Peace court for non-support of the children. The evidence reflected that friends, including Virden, and members of the Christian and Methodist churches, helped in supporting the children. Mrs. Relaford was employed at the Prescott Manufacturing Company, earning $38.80 net per week.

Even though it should appear that Mrs. Relaford had engaged in improper conduct with some man, the evidence would indicate that these alleged offenses were condoned, since Mr. Relaford continued to live with his wife during, and after, the period of appellant's alleged immoral behavior.

Be that as it may, the record falls far short of establishing adultery, or that his wife had become "interested sexually in divers men". The charge of sexual promiscuity or infidelity is probably the most offensive charge one spouse can make against the other, and it has been frequently held that to make such a charge without basis is an indignity entitling the person charged to a divorce. As stated by the Court of Appeals of Kentucky in the case of *Wiggins* v. *Wiggins*, 104 S. W. 2d 1097:

"It has been repeatedly held by us that the husband's making of an unfounded charge of lascivious conduct against an innocent wife is in itself evidence of and constitutes cruel and inhuman treatment within the meaning of the statute, entitling the wife to divorce, except where the charge is made, not maliciously but in good faith, upon reasonable grounds for believing it, even though held untrue. (citing cases) Also, we have held that accusations in pleading of spouse as to improper conduct of the

---

[1] According to her testimony, he had only given the $13 since June, 1960.

other spouse, where not supported by such evidence as to imply good faith, constitutes cruel and inhuman treatment where false and malicious. * * *

"Clearly, the testimony of the husband and his witnesses as to instances of alleged misconduct on the part of his wife, upon which he here based his charge that she was loose and lascivious in her behavior, was found to be altogether without substance or of the quality to induce conviction, and therefore, his baseless charge having only such support (which amounted to no support), it must needs have been made by him not in good faith but maliciously, and as such constituted, as set out *supra,* cruel and inhuman treatment within the meaning of the statute and entitled her, we conclude, to an absolute divorce and reversal of the judgment as erroneous, in so far as it failed to grant her such."

Also, in *Land* v. *Land* (Kentucky), 132 S. W. 2d 742.

"Clearly the venomous character of defendant's accusations and charges made against the chastity of his wife, when unsupported by any substantial and probative evidence, in itself constitutes cruel and inhuman treatment of her."

Appellant's charges, at the most, could have been based on no more than suspicion, and suspicion is not sufficient to justify one in maligning the character of his spouse, either by spoken charge, or by written pleading. Since the charge was unsupported by any substantial evidence, we consider it an indignity entitling appellant to an absolute divorce, and so hold. The awarding of the custody of the children to appellant, being indicative of the fact that the trial court found no substantial evidence of immorality on the part of the mother, is upheld.

While the custody of the children is not at issue in this appeal, it is interesting to note that Mrs. Relaford demonstrated her interest in both the physical and spiritual welfare of the children. The pastor of the First Christian Church in Prescott, along with his wife, the Mayor of Prescott, and a member of the City Council, all

testified that the mother and children attended church and Sunday school, and that the children were well behaved, polite, well supervised, and appeared to be happy.

The decree is reversed, insofar as it fails to grant appellant a divorce, and the cause is remanded with directions to enter a decree not inconsistent with this opinion.